Filed 7/24/14  In re E.C. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re E.C. et al., Persons Coming Under the Juvenile Court Law. | B249085 |
| | (Los Angeles County Super. Ct. No. CK97191) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. L.C., et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Rudolph Diaz, Judge.  Reversed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant L.C.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant Victor F.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court sustained a petition in which the Los Angeles County Department of Children and Family Services (DCFS or the department) alleged six-year-old Jessica F. was put at risk of physical harm by use of inappropriate physical discipline by her father's girlfriend, L.C. Specifically, L.C. pinched Jessica's nose, causing it to bleed, and slapped the back of her hands, causing her to cry. The juvenile court detained the minor from father and placed her in foster care pursuant to Welfare and Institutions Code sections 300, subdivisions (a) and (b), and 361.2, subdivision (a).[1] (On appeal, DCFS abandons its subdivision (a) allegation.) Father challenges the jurisdictional and dispositional findings, arguing insufficient evidence supports the court's findings. We agree and accordingly reverse.

## FACTS AND PROCEEDINGS BELOW

The family in this case consists of father, L.C., Jessica, L.C.'s five-year-old son and father's and L.C.'s infant son. When Jessica's mother was deported to El Salvador she first moved in with paternal relatives, then with father and L.C. Jessica did not like L.C. and did not want to live with her. She refused to follow L.C.'s instructions, refused to do her schoolwork, and cried and lied when she did not get her way. She was also susceptible to nosebleeds, frequently getting them, according to a foster parent, when she played outdoors during hot weather.

In October 2012, eight months after Jessica moved in with father and L.C., DCFS received an anonymous referral indicating an anonymous family member had reported that L.C. hit Jessica often, slapped her face, would force her to bend over and then stack luggage on her back, and two weeks earlier grabbed her nose and pulled it with so much force that she broke a nail. The reporting party stated the family member had stated L.C. would pinch Jessica on the chest, leaving a purple mark.

DCFS investigated.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Jessica reported to DCFS that L.C. had hit her, pinched her chest, and struck her on the knees with a belt. The social worker found no marks or bruises, and several months later Jessica later recanted the story. Jessica's teacher reported she did not believe Jessica was being abused in the home and stated L.C. had told her Jessica was having behavioral issues at home and was defiant and angry most of the time. The teacher stated Jessica cried often when upset, including when she did not want to go home.

Father admitted to spanking Jessica when she misbehaves but denied the allegations of abuse by L.C. He stated Jessica was defiant toward his brother when she lived with him and told father she was being hit by his brother and his wife, which led father to bring her to live with him. Father stated L.C. used only "time outs" as a means of discipline.

L.C., who at the time was eight months pregnant, denied the abuse allegations and stated Jessica was a "liar." She reported she had been called to the school to discuss discipline issues reported by Jessica's teacher, who had said Jessica was defiant and refused to listen in class. L.C. reported that Jessica's nose bleeds easily, and just the other day it bled when she bumped into a playmate. However, L.C. later denied ever having seen Jessica with a bloody nose. L.C. stated she used only time outs as discipline.

An uncle in the home stated the reporting party was exaggerating, and he did not believe any abuse occurred.

On October 23, 2012, Jessica told police L.C. slapped her once in the face. Months later she admitted to a social worker she lied about that.

On October 25, 2012, Jessica told a medical professional that L.C. would sometimes slap her hand and had once grabbed her nose and caused it to bleed. She said, L.C. "was mad. I was supposed to clean my room and I was sitting on the sofa. She made my nose bleed with her hand. She put my shirt right on my nose to stop bleeding." Jessica denied having been hit with any object.

In December 2012, DCFS detained Jessica.

3

In January 2013, L.C. again denied any abuse and told a social worker Jessica once suffered a bloody nose when she hit herself with a toy by accident. She said Jessica lies frequently and needed therapy because she had abandonment issues.

Father repeated that discipline in the home consisted of time outs and said he had never seen any evidence of physical abuse, and if he had, he would have called the police himself.

In February 2013, Jessica told a social worker, "[L.C.] pinched my nose, but only on one side. It was bleeding a little bit." The investigator asked, "When did this happen?" Jessica replied, "This happened last month in January. . . . I was sitting on the sofa in the living room. Dad was in his bedroom. I was playing in the living room with [L.C.'s] son and [L.C.] said, 'Stop playing.' Her son stopped but I kept playing and that's when she pinched my nose. I cried and my dad came into the living room to see what was going on. He saw my nose bleed and took one of my shirts and put it on my nose to stop the bleeding and then told me to go into the bedroom so that he and [L.C.] could talk. After they talked, he . . . told me to go outside and play in the front yard. . . . [¶] I made up all of the other stuff about [L.C.] hitting me on my knees with a belt and hitting me in my face and pinching my chest and grabbing me by the waist with her hands. . . . Because I didn't want to live there anymore. I wanted to stay somewhere else, like here [in foster care]. I like it here. . . . I don't like [L.C.]. I don't want my dad to have a girlfriend. [L.C.] already has a baby and a boy and she doesn't like me. When I asked her for some Yogurt, she would not give me any but she gave some to her son and the baby but not to me. . . . [Father] got married to [L.C.] and now he won't listen to me and that is why I made up some of the story. My mom does not like [L.C.] either. She talked to me . . . on the phone not long ago . . . and I know that she and [L.C.] are not friends. No, my mom never said anything bad about [L.C.] to me. I just don't like her. . . . [¶] . . . . I like my Dad but I don't want to live with him because I don't like [L.C.] and I don't want to live with them. One time [L.C.] hit me with her hand on the back of my hand. I cried a little bit. . . . I am afraid of [L.C.] but I am not afraid of my dad."

On the same day, a paternal great-aunt living in the home reported she knew Jessica was being abused because the child had told her so and would not lie about such things. However, the paternal grandmother and a paternal uncle both stated Jessica sometimes "would lie about things," including making false allegations of abuse.

Jessica's foster mother reported that during the first few weeks of foster care, whenever Jessica "wanted something but could not get her way, she would cry. She would cry about everything. . . ." The foster mother also reported that in the space of two months Jessica had had "two nose bleeds due to her being outside in the sun for a long period of time." Father and L.C. visited Jessica approximately once a week, during which Jessica would run to L.C. and give her a hug, "as though she was very happy to see her." Jessica was always happy to see them and told the foster mother she enjoyed visiting with them "but does not want to live with them."

No school official, teacher, social worker, medical professional, police officer, or relative reported ever seeing any mark on Jessica's face or hands.

DCFS recommended that Jessica be removed from father's custody and reunification services ordered.

No further evidence was presented at the jurisdiction hearing. Although Jessica was present at the hearing, she did not testify, and the matter proceeded by argument alone.

After argument, the trial court sustained both the subdivision (a) and (b) allegations of the section 300 petition as follows: "On a prior occasion in 2012, [L.C.] inappropriately disciplined the child by grabbing the child's nose, inflicting a bleeding laceration to the child's nose. On prior occasions, [L.C.] struck the back of the child's hands . . . . Such inappropriate discipline was excessive and caused the child unreasonable pain and suffering. The father failed to protect the child. The father knew or reasonably should have known of the physical abuse of the child by [L.C.], and allowed [L.C.] to reside in the child's home and have unlimited access to the child. Such inappropriate discipline of the child by [L.C.] and the father's failure to protect the child endangers the child's physical health and safety and places the child at risk of physical

5

harm, damage, danger, physical abuse and failure to protect."[2]  The court also sustained a separate petition as to L.C.'s other children based solely on Jessica's story of having had her nose pulled.  The court declared all the children wards of the court, ordered Jessica removed from the home, and ordered that reunification and parenting services be provided.[3]

Three weeks after the adjudication, before father filed his notice of appeal, father told social workers he could not understand why they would believe Jessica.  He said he had no time for reunification services and in fact did not want to reunify.  Because Jessica did not want to live with him, he would prefer that she be placed with his cousin, who lived down the street.  L.C. agreed, stating she did not want Jessica back in the home and would not take her children to visit her, as she did not want them around her.

Father nevertheless appealed the juvenile court's orders.

## DISCUSSION

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings.  [Citations.]  The term 'substantial evidence' means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value.  [Citation.]" (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  "In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact." (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)  In other words, "[i]t is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence.  We have no power to judge the effect or value of the evidence, to weigh the

---

[2] The court sustained the subdivision (a) allegation despite there being no evidence whatever that father committed any abuse.  DCFS abandons this allegation on appeal.

[3] The parents filed a separate appeal as to the other children but the juvenile court later terminated jurisdiction over them, rendering that appeal moot.  We consequently granted DCFS's motion to dismiss it.

6

evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citations.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.) "In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason." (*In re Ricardo L.*, *supra*, at p. 564.)

Father contends insufficient evidence supported the juvenile court's assertion of jurisdiction under subdivision (b) pertaining to domestic violence perpetrated by L.C. We agree.

A child comes within the jurisdiction of the juvenile court under subdivision (b) of section 300 if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ."

The only evidence that Jessica suffered any injury was her own story, told first to a relative, then to a social worker, then to police, then to a medical professional, and finally to another social worker, that L.C. pinched her nose, causing it to bleed, and slapped her hand. This was not substantial evidence.

In any question involving the testimony of a small child a question naturally arises as to whether the child can distinguish between truth and fantasy and appreciate her responsibility to tell the truth. (See, e.g., *Ballard v. Superior Court* (1966) 64 Cal.2d 159.) Here, the court asked Jessica no questions, made no inquiry to determine her ability or desire to distinguish truth from fantasy, and took no opportunity to observe her demeanor when she related her story, or even to see whether she would maintain that L.C. had pulled her nose. These were critical omissions, as Jessica was an admitted yarner. When she told a relative and, two weeks later, a social worker about the nose pinching she also said she had been pinched in the chest, slapped in the face, and strapped across the knees, yet later admitted these never occurred. She told the police much the same tale but later admitted she fabricated it. In February 2013, she told a second social

7

worker about the nose pinching, but said it occurred "last month," i.e., in January 2013, three months after DCFS's investigation into the pinching began.

Several family members, a teacher, a foster parent, and Jessica herself reported she was defiant and disobedient, frequently cried when not getting her way, and often lied. Jessica herself admitted she fibbed about L.C.'s actions because she did not want to live with her, because she did not want her father to have a girlfriend, did not like it when on occasion did not get her way, such as when it was time to stop playing and clean her room, and did not like it when L.C. gave yogurt to her own children but not her. Further, several parties reported that Jessica suffered nosebleeds easily, which gave the six-year-old a real malady upon which to ground a well-rehearsed and temporally changeable story about being pinched and made to bleed.

No other evidence supported jurisdiction. No mark was ever found on Jessica consistent with the line she ultimately settled on, and no other sign of abuse, neglect, or discord in the home—other than was caused by Jessica herself—existed.

An appellate court does not weigh believability. But an internally inconsistent out-of-court story told by an indisputably—and self-admittedly—willful, manipulative, disobedient, tantrum-throwing six-year-old who selectively acknowledged most of the tale was untrue, who admitted to lying on multiple occasions—to relatives, social workers and police—to achieve exactly the result she ultimately did achieve, and who in using the same libretto on different occasions placed the crucial event at inconsistent and impossible times, is not such "evidence as a reasonable mind would accept as adequate to support a conclusion [, i.e.,] evidence which is reasonable in nature, credible, and of solid value." (*In re J.K.*, *supra*, 174 Cal.App.4th at p. 1433.)

We need not decide whether nose pinching presents a substantial risk of serious physical harm because no reasonable trier of fact could conclude based on the hearsay statements of a six-year-old self-confessed fibster that any pinching occurred here.

**DISPOSITION**

The orders of the juvenile court are vacated.

NOT TO BE PUBLISHED.

                                                    CHANEY, J.


We concur:



ROTHSCHILD, P. J.



MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.